**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| ANTONISHA B. BROWN,<br><br>          **Plaintiff,**<br><br>    vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>        **Defendant.** | **CASE NO.  8:13CV266**<br><br>**MEMORANDUM<br>AND ORDER** |

Antonisha B. Brown filed a complaint on August 23, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.) Brown seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C §§ 1381 et seq. The defendant has responded to Brown's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 9, 10-11). In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated November 19, 2013, (ECF No. 13), each of the parties has submitted briefs in support of her position. (See generally Pl.'s Br., ECF No. 16; Def.'s Br., ECF No. 21, Pl.'s Reply Br., ECF No. 23). After carefully reviewing these materials, the court finds that the Commissioner's decision should be affirmed.

**I. PROCEDURAL HISTORY**

Brown, who was born on May 25, 1986, (tr. 162) filed an application for children's disability insurance benefits under Title II and for SSI under Title XIV on September 13,

2006. (Tr. 163, 170, 425, 430). She alleged an onset date of January 22, 2000. (Tr. 170). Brown's application for disability benefits was denied initially on November 13, 2006, (tr. 170, 184-91) and on reconsideration on January 18, 2007. (Tr. 170, 194-201). At Brown's request, a hearing was held before an administrative law judge (ALJ) on September 8, 2009. (Tr. 170). Brown amended the alleged onset date to September 14, 2006. (Tr. 170). On September 22, 2009, the ALJ found that Brown had not been under a disability from September 14, 2006, through the date of the decision. (Tr. 170-179).

The Appeals Council remanded the case to the ALJ in an order entered on December 3, 2010. (Tr. 180). The Appeals Council directed the ALJ: 1) to determine whether Brown's asthma is a severe impairment; 2) to determine whether the criteria of section 12.05 of the Listing of Impairments were met based on Brown's mental and physical impairments; 3) to further consider Brown's maximum residual functional capacity (RFC) during the entire period at issue and to provide a rationale with specific references to the evidence in the record; 4) to consider and assign appropriate weight to the opinion of third party Catherine Brown; and 5) to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Brown's occupational base. (Tr. 181-83).

After another hearing on September 21, 2011, the ALJ entered a decision on January 23, 2012, finding that Brown was not disabled. (Tr. 11-24). An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the

2

claimant is currently engaged in substantial gainful activity (SGA). *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). Although Brown had worked after the alleged disability onset date, the ALJ found that the work activity did not rise to the level of SGA. The ALJ noted that Brown worked no more than 18 hours per week at approximately $8 per hour as a caregiver for an elderly person. Her monthly earnings of approximately $620 did not represent SGA. The ALJ found that Brown had not been engaged in SGA since September 14, 2006, the alleged onset date. (Tr. 13).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found that Brown had the following severe impairments: depression, intellectual impairment, obesity, lumbar sprain, muscle strain, and asthma. (Tr. 14). The ALJ noted that he had considered Brown's asthma, pursuant to the order of the Appeals Council on remand.

3

The ALJ found that, given evidence of repeated office visits for respiratory symptoms, Brown's asthma was a severe impairment. (Tr. 14).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Brown did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 14).

Step four requires the ALJ to consider the claimant's residual functioning capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Brown had no past relevant work. (Tr. 22).

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled. The ALJ found that Brown had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). (Tr. 17). The ALJ

---

[1]   "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

4

found that Brown could lift 20 pounds occasionally and 10 pounds frequently. In an eight-hour day, she could sit for six hours and stand for six hours. With the opportunity to alternate sitting and standing as necessary, she could complete an eight-hour workday. (Tr. 17). The ALJ found that Brown had the unlimited use of her extremities and could continuously handle, finger, feel, and perform similar functions. She should not climb ladders, scaffolding, or similar structures. She could at least occasionally climb stairs. She could occasionally stoop, kneel, crouch, and crawl. She should try to avoid fumes, odors, astringents, and things of that kind, but she had not had problems with those items in the normal housework she had been doing. She could operate a motor vehicle. (Tr. 17).

The ALJ stated that, due to Brown's educational level, she was limited to unskilled work and she should not work with the general public. She was moderately limited in interacting appropriately with supervisors and coworkers and she could follow, understand, and carry out simple instructions. The ALJ noted that Brown could read some and write some, but not much. She could make a simple list of food or other items for the grocery store and could read a list written by someone else. (Tr. 17).

Considering Brown's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Brown could perform. (Tr. 22). Therefore, Brown had not been under a disability from the alleged onset date through the date of the decision.[2] (Tr. 23). The Appeals Council denied further review on June 25, 2013. (Tr. 1-5). Thus, the ALJ's decision stands as the final

---

[2] The ALJ referred to an onset date of March 1, 2006, in his decision. (Tr. 23). However, the court believes the date is incorrect. All other references to the onset date are to September 14, 2006, which is the day after the applications were filed.

decision of the Commissioner, and it is from this decision that Brown seeks judicial review.

## II. FACTUAL BACKGROUND

### A.    Medical Evidence

Brown alleged, and the ALJ determined, that she suffered from depression, intellectual impairment, obesity, lumbar sprain, muscle strain, and asthma. (Tr. 14). The medical evidence of physical impairments is limited.

Brown alleged that she had been in at least two automobile accidents that resulted in back pain. An MRI of her cervical spine on May 19, 2006, showed normal alignment. There was no evidence of central or foraminal stenosis. (Tr. 599). On May 27, 2006, Brown was in a car accident and went to the emergency room complaining of back pain. (Tr. 597). She reported that she had chronic back pain. However, she refused x-rays and was prescribed pain medication. (Tr. 598).

On February 9, 2009, Brown went to the emergency room complaining of muscle pain after she was hit in the face and neck in an altercation with another woman. (Tr. 874). She was prescribed muscle relaxers. (Tr. 875).

Medical records from Alegent Health Family Care Clinic between the alleged onset date and November 2008 showed that Brown had received treatment for routine health concerns, including neck pain, low back pain, bronchitis, cough, and sore throat. (Tr. 876-893). She was prescribed medications, although it does not appear that she was given any narcotic pain relief medication for her alleged musculoskeletal pain. (Tr. 876-893).

**B.     Medical Opinion Evidence**

Brown took part in several consultative examinations, both physical and mental. At the first examination on January 31, 2006, Brown reported that she had a learning disability and could not read or comprehend. (Tr. 580). She also complained of chronic back pain, which she said limited her ability to bend, twist, stoop, kneel, crawl, climb, and walk upstairs. Brown blamed the back pain on two automobile accidents and the delivery of her last child, which she said required four epidurals. (Tr. 580). Eric J. Rodrigo, M.D., noted that Brown's affect was normal. She did not use any assistive devices, but she had some difficulty getting to and from the table, up and down from the chair, and to and from the exam room. (Tr. 583). Brown was found to have relatively good use of her cervical spine. Dr. Rodrigo stated that Brown might have difficulty bending to pick up items from the ground, but otherwise she would have no deficits handling objects. (Tr. 586). Brown was found to have no overt mental impairments, but apparently had a learning disability, which might affect her ability to understand, carry out, and remember instructions. Dr. Rodrigo stated that Brown should respond appropriately to supervision and coworkers in a normal work setting. (Tr. 587).

Barbara C. Schuett, M.A., conducted a consultative psychological examination on the same date. (Tr. 588). Brown's mother accompanied her and completed the psychological questionnaire because Brown had problems with reading and spelling. (Tr. 588). Brown reported that she had been in special education in school, where she completed the 10th grade. She never obtained a GED. Schuett reported that Brown continued to have problems reading, but she had learned to handle her own money. She had never been married, but had three children, ages 5, 1, and 3 months. Schuett

7

noted that Brown had been in psychiatric therapy at Creighton Psychiatry, but was told not to come back because she would not follow through with recommendations made by the therapist. She was currently seeing another therapist. Brown had been prescribed Wellbutrin and Zyprexa, but she reported they made her feel like a zombie. (Tr. 589). However, Schuett reported that the medications must have been working well for Brown because she reported that her problems were not difficult. (Tr. 589-90).

On an intelligence test, Brown's IQ scores were 64 full-scale, 67 in verbal, 64 in performance, 74 in verbal comprehension index, and 67 in perceptual organization index. Schuett noted that the scores suggested a mild range of mental retardation, but Brown was able to live on her own and take care of three children with help from Brown's mother. (Tr. 590). Brown's mood was not depressed and her affect was variable. There was no indication of a psychosis. Her judgment and insight were fairly good. (Tr. 592).

Schuett found that Brown's restrictions in activities of daily living arose from mild mental retardation. (Tr. 593). Brown had no problems in social functioning. She could concentrate, attend to a task to complete it, and understand, remember, and carry out short and simple instructions under ordinary supervision. She could relate appropriately to coworkers and supervisors. Schuett stated that Brown's prognosis was good and that she was doing well on medication and was handling her children adequately. (Tr. 593).

On October 23, 2006, Schuett conducted a second examination, noting that Brown was applying for disability again. (Tr. 661). Schuett noted that Brown was very negative, argumentative, difficult, and disrespectful. She refused to complete the psychological questionnaire, even though she reported she could read. She had her

8

mother complete the form for her. Brown reported that she had been depressed in the past, but denied that she was currently depressed. She said she did not want to do anything and wanted to be alone. She had stopped going to a therapist and stopped taking her medication. Brown reported she had a little trouble concentrating. (Tr. 662).

Schuett determined that Brown was functioning higher than her demonstrated IQ scores and that she had learned to take care of her children and her home and to manage her money. Schuett stated that Brown was moderately depressed and her affect was mostly negative. (Tr. 664). Schuett stated that Brown had restriction in activities of daily living because she had stopped taking medication and going to therapy. (Tr. 660). She had difficulty in maintaining social functioning because she did not get along with people. She had recurrent episodes of deterioration when stressed, but she had the ability to sustain concentration and attention needed for task completion. (Tr. 660). Her prognosis was questionable because she had been noncompliant with treatment in the past, and it could reoccur. (Tr. 666).

Patricia Newman, Ph.D., completed a mental RFC on November 9, 2006. (Tr. 676-78). She determined that Brown had no significant limitations in the ability to remember locations and work-like procedures, to understand, remember, and carry out short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, and to make simple work-related decisions. (Tr. 676). Brown had moderate limitations in the ability to understand, remember, and carry out detailed instructions, to work in coordination with or proximity to others without being distracted by them, to

9

complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 676).

In social interaction, Newman found that Brown had no significant limitations in the ability to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. (Tr. 677). Brown had moderate limitations in the ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Brown had no significant limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independent of others. (Tr. 677). Newman found that Schuett's opinion that Brown was functioning at a higher level than shown by her IQ scores was consistent with the mental status examination and other evidence and, therefore, the opinion was given considerable weight. (Tr. 678).

Newman agreed that Brown was able to live independently, care for several small children, and handle her own money. She reported a history of mental health treatment in the past, but none recently. Although Brown reported being prescribed Zoloft, but did not indicate she had received any type of mental health treatment. Brown had exhibited some apparent drug-seeking behaviors and by her own report was taking medications from friends and family that had not been prescribed for her. Newman stated that the overall pattern of evidence was partially consistent with Brown's

allegations in that psychological conditions were present, but the evidence was not consistent with marked psychological limitations. Brown appeared capable of work activity as outlined in the mental RFC. (Tr. 678). Jennifer Bruning Brown, Ph.D., affirmed the mental RFC. (Tr. 713). Newman also completed a psychiatric review technique, in which she stated that Brown had a learning disorder, not otherwise specified (NOS), and a personality disorder, NOS. (Tr. 681, 687). Brown had mild limitations in activities of daily living and in maintaining concentration, persistence, or pace, and moderate limitations in maintaining social functioning. She had no repeated episodes of decompensation. (Tr. 690).

In a physical RFC assessment, Glen Knosp, M.D., determined that Brown had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. 696-99). After reviewing the medical evidence, Dr. Knosp found no documentation of any medically determinable impairment. Brown's MRIs were normal and there was very little in the findings other than her subjective complaints of pain. (Tr. 703). The records showed possible drug-seeking behaviors. She reported a history of asthma and use of an inhaler, but there was no evidence that she had actually been seen by a physician for the condition, and she had not been prescribed any inhalers. Her lungs had been clear on repeated exams. Brown had failed repeatedly to go to the pain specialist as recommended and had not been seen by any specialist for her conditions. Dr. Knosp stated that Brown became angry and upset when she could not have narcotics and threatened to go to the emergency room to get the medications that she wanted. She used no assistive devices for ambulation. Brown had bilateral positive straight leg raise, but it was noted at two different exams since January 2006, she had

negative straight leg raises. At her most recent obstetrics visit, she had not mentioned any back problems or chronic pain. Dr. Knosp found Brown's allegations were not consistent with the evidence and were only partially credible. Considering the overall evidence, Dr. Knosp found that Brown's physical condition was nonsevere. (Tr. 703).

A.R. Hohensee, M.D., completed a physical review on January 11, 2007. (Tr. 712). He found that the medical evidence failed to show that Brown had significant limitations in activities of daily living. She had recently complained of carpal tunnel and back pain, but exams showed little evidence of either. Brown had been given a prescription for wrist splints and had been attending physical therapy for back pain. The medical evidence over the past year had failed to identify any severe physical issues. She had demonstrated possible narcotic-seeking behavior and alleged physical limitations that were in no way supported by objective medical evidence. (Tr. 712).

On February 5, 2009, Donna M. Adams, LMHP, conducted an evaluation and noted that Brown's intelligence was estimated to be in the below average range. Her thought processes were clear and coherent without any evidence of psychotic process. Her affect and mood were normal. She was resuming counseling due to depression and overwhelming stress. Brown was very self-critical. Her depression had become worse since she had been on her own raising her children. Brown was assessed with major depressive disorder, recurrent, moderate, posttraumatic stress disorder, and parent-child relational problems. (Tr. 799). It was recommended that she attend therapy twice per week and family therapy once per month. (Tr. 800).

Amy T. Corey, Ph.D., completed a psychological evaluation on June 15, 2009, and administered IQ tests. Brown's full-scale IQ was 57, and she scored 61 on verbal

12

comprehension, 60 on perceptual reasoning, 63 in working memory, and 68 on processing speed. (Tr. 806). Corey did not administer the Minnesota Multi-Phasic Personality Inventory-2 (MMPI-2) because it required a sixth-grade reading level, and Corey believed Brown's limited verbal skills and comprehension would invalidate the results. (Tr. 803). Brown reported that she was on the honor roll in elementary school, but when she entered middle school, the work was too difficult and she began "acting up." She believed she was going to be placed in special education in high school, but she dropped out at age 16. Brown claimed she had limited comprehension and poor spelling skills. (Tr. 804).

Brown reported that she gave birth to her first child when she was 14. At the time of the evaluation, she had four daughters, ages 9, 4, 3, and 2. She was living alone with her children and received help from her mother. Brown reported she worked 18 hours per week doing in-home care for a disabled woman. She often did not go to work on the assigned days when she felt irritable and then made up the hours on another day that week. Brown reported that she worked in a supply department stocking equipment for two weeks, but she did not continue due to interpersonal conflict. (Tr. 804). Brown stated she had back pain almost daily for the last several years. Brown was unsure of the reason for her pain, but she thought it could be due to a past car accident or being overweight. She was taking Darvocet for the pain. (Tr. 804).

Brown reported a history of outpatient counseling, but she did not get along well with one counselor and did not always attend because she did not feel like it. She had been taking antidepressant and sleep medication, which improved her mood significantly and helped her sleep, but she had not taken it for a month. She stopped

refilling it because she was frustrated about the time it took to get the refills. Brown did not recall the names of the medicines or who prescribed them for her. (Tr. 805).

Corey reported that Brown was able to sustain her attention and concentration adequately. Her thought process was coherent and goal-directed. Her affect was appropriate and her judgment and insight were poor. (Tr. 807). In a typical day, Brown reported she took care of her children with help from her mother. Brown cooked, cleaned, and spent time with her children. When Brown worked, the children attended daycare with a friend. (Tr. 807).

Corey stated that Brown had mild impairment in making judgments on simple work-related decisions. She had marked limitations in understanding, remembering, and carrying out complex instructions, and making judgments on complex work-related decisions. Because of her limited comprehension, she would have marked difficulty in understanding and carrying out complex instructions without close supervision. Due to her poor judgment, she would be unable to adequately respond to complex work-related decisions. She also had difficulty sustaining mental effort. (Tr. 807). Corey noted that Brown had a long history of interpersonal conflict, which impaired her ability to interact appropriately with supervisors, coworkers, and the public, as well as to respond to changes in the work setting. Brown was moderately impaired due to her interpersonal conflict and irritability. Corey stated that Brown's social skills were limited and she could be defensive, but overall she was cooperative and compliant during the evaluation process. (Tr. 807-08).

Corey assessed that Brown had oppositional defiant disorder, primary insomnia, eating disorder NOS, rule out dysthymic disorder. Corey stated that Brown's level of

14

intellectual functioning was not expected to improve over time. Her adaptive functioning was limited in the areas of self-direction, functional academic skills, parenting, and social skills. She had learned many other adaptive skills, but relied on her mother for much support. Corey stated that Brown would benefit from resuming medication, since she stated it improved her mood and sleep and it likely could provide some improvement in her interpersonal relationships. (Tr. 808).

Corey completed a medical source statement, in which she indicated that Brown had no restriction in the ability to understand, remember, and carry out simple instructions. (Tr. 809). She had mild restrictions in the ability to make judgments on simple work-related decisions. Brown had marked restrictions in the ability to understand, remember, and carry out complex instructions, and in the ability to make judgments on complex work-related decisions. Brown admitted she had problems complying with authority figures and she was likely inflexible. (Tr. 810).

On August 26, 2009, Antoinette L. Tribulato, M.D., conducted an evaluation of Brown's alleged back pain. (Tr. 822). Brown reported that the pain kept her from being able to work, exercise, or have fun, but she had never been hospitalized for the back pain. She said she could not sit for more than five minutes at a time or stand for more than five minutes. Dr. Tribulato noted that Brown was able to stand, sit, and get on and off the examining table. She got up and moved around and also sat for more than 15 minutes without any difficulty. There was no muscle wasting or weakness, atrophy, palpable muscle spasms, joint deformity, tenderness or effusions. Her lumbar and lateral exams were normal. (Tr. 823).

Dr. Tribulato determined that Brown's muscle strain was most likely related to her obesity and lack of conditioning. Dr. Tribulato recommended exercise and diet for weight loss. Brown reported that she had been to physical therapy and tried pain medicines, but she said nothing seemed to help. Dr. Tribulato noted that Brown showed no signs of significant depression, but she was on medication for it. She had some difficulty with reading and writing. (Tr. 829). She did not use any assistive devices and none was medically necessary. Humidity and wetness did not bother her, but due to her diagnosis of asthma, she should avoid dust, odor, fumes, and pulmonary irritants. (Tr. 830). Dr. Tribulato stated she knew of no reason that Brown should not be able to work. (Tr. 842).

Dr. Tribulato completed a medical source statement of Brown's ability to do work-related activities. (Tr. 843). Dr. Tribulato indicated that Brown could continuously lift and carry up to 10 pounds, frequently lift up to 20 pounds, and occasionally lift between 21 and 100 pounds. (Tr. 843). Brown could sit, stand, and walk for one hour at a time and could sit, stand, or walk for eight hours in an eight-hour workday. (Tr. 844). Brown had no limitations on the use of her hands and she could continuously operate foot controls. (Tr. 845). Brown could continuously climb stairs and ramps, but never climb ladders or scaffolds. She could occasionally stoop, kneel, crouch, and crawl, but had difficulty due to her morbid obesity. None of her impairments affected her hearing or vision. (Tr. 846). Brown had no limitations on moving mechanical parts, operating a motor vehicle, humidity and wetness, extreme cold and heat, or vibrations. She could tolerate loud noise. (Tr. 847). Dr. Tribulato stated that Brown was able to shop, travel without a companion for assistance, ambulate without using an assistive device, walk a block at a

16

reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene, and sort, handle, and use paper. Dr. Tribulato stated that the limitations would last until Brown lost weight. (Tr. 848).

## C.    Hearing Evidence

At a hearing on July 22, 2009, Brown stated that she was unable to work because she could not spell or read and sitting and standing hurt her back. (Tr. 56-57). She was working 18 hours per week in home health care, which included mild cleaning, dusting, preparing meals, acting as a companion, and taking her client on errands. (Tr. 57-58). Brown said she completed the eighth grade and could read small words. She sometimes read children's stories, but not magazines or newspapers. (Tr. 58). She said the biggest problem that kept her from working full-time was getting along with people. (Tr. 59-60). Brown said she got irritated easily and did not like anyone telling her what to do. She said she had certification as a nurse assistant, but she was unable to chart because of her spelling. Brown said she had never tried to work as a certified nurse assistant (CNA) because she shadowed another CNA and they asked her to spell words that she could not spell. (Tr. 60).

Brown said she had last been to a clinic for her back about a month earlier, and she was given a muscle relaxer. (Tr. 61). She also said she was seeing a counselor for depression, but she had missed sessions and she didn't remember the reason. (Tr. 62). Brown said her lower back pain made it difficult to get up in the morning, and sometimes it was hard to lie down. (Tr. 64). Her mother helped her complete necessary forms for doctor visits or public assistance. (Tr. 66). Brown said she was not able to clean the

bathroom for her client. (Tr. 67). She said she could sit or stand for about 15 or 20 minutes. (Tr. 75). Brown said her mother came to her house in the morning to take care of her children until Brown decided to get up. (Tr. 71). Brown said she did everything for her children, including cooking, cleaning, getting them dressed, and giving them baths. (Tr. 77).

Brown's counsel stated that Brown was not seeking disability for back pain or spinal disorder, but rather for her low intellectual functioning and depressive symptoms. (Tr. 79). The hearing was adjourned in order to obtain additional medical records about Brown's physical condition. (Tr. 83).

On September 8, 2009, Brown's counsel stated that no additional records had been provided because Brown had not received any treatment between January 2006 and August 2009. (Tr. 88). Brown's mother, Catherine, testified that she helped Brown with paperwork, taking care of the children, and buying groceries. She said Brown cannot read well enough to complete paperwork or business papers. (Tr. 94). Catherine said Brown finished the 10th grade in school and was in special education classes after Catherine insisted on it. She said Brown read at the third grade level. (Tr. 96).

Anita Howell, vocational expert (VE), testified that Brown did not have any SGA in the past. (Tr. 103). The ALJ asked about other employment that would be available to a hypothetical individual of the same age, education, and past work history as Brown, who could occasionally lift and carry up to 50 pounds, frequently lift 11 to 20 pounds, and continuously lift 10 pounds, could sit, stand, or walk for eight hours, could continuously reach overhead, handle, feel, and finger, could not climb any ladders or scaffolds, but could climb stairs and ramps at least frequently and probably

18

continuously, could stoop, kneel, crouch, and crawl on an occasional basis, should avoid unprotected heights, dust, odors, fumes, pulmonary irritants, could shop, drive a car, take care of her personal hygiene, had mental limitations which would require her to do unskilled work, would have moderate limitation in getting along with the public, supervisors, and coworkers, and would probably also have a difficult time responding to changes in the work setting. Howell said the individual would be able to work as a linen room attendant, which is a medium job and would allow for alternating sitting and standing. (Tr. 104-05). In Nebraska, there were approximately 280 jobs, approximately 2,000 jobs in the four-state region, and 41,200 jobs in the U.S. (Tr. 105). Other representative jobs that the individual could work at included 1) a folding machine operator, which was a light job, and in Nebraska, there were approximately 115 jobs, in the four-state region, there were 610 jobs, and in the U.S., 10,900 jobs; and 2) assembler of small products, which was also a light job, with 175 jobs in Nebraska, 700 jobs in the four-state region, and 20,160 jobs in the U.S. (Tr. 105-06). Howell said that Brown's current job as a home health care attendant was classified as a medium semi-skilled job. (Tr. 106). In Nebraska there were approximately 3,710 jobs, in the four-state region, 35,090 jobs, and in the U.S., 751,480 jobs. (Tr. 106-07).

At a hearing after remand, on July 11, 2011, Brown testified that she was unable to work because she could not get along with people, she could not sit or stand too long, she had chronic pain in her back, she could not breathe well, and she could not spell well. (Tr. 115). Brown was continuing to work as a home health care attendant. (Tr. 116). She said she had passed the CNA test after her third attempt. (Tr. 120-21). The last medical record showing any treatment for Brown's back was in December 2010,

19

although Brown said she had last seen a physician for back pain two or three months earlier. (Tr. 122, 125).

Additional records were requested after the hearing. On September 21, 2011, the ALJ noted that there were no new medical records. Brown had refilled prescriptions and had seen a new counselor, but she had not been to a physician. (Tr. 145-46). She had only seen the new counselor once. She made no further appointments after her car broke down and it took one month to get it fixed. (Tr. 147).

Steven Schill, VE, stated he had no record of Brown's earnings so he could not determine whether she had any SGA. (Tr. 153). Records showed that Brown had consistently made in the $8,000 range yearly since 2008, which would not constitute SGA but would constitute past relevant work. (Tr. 153). The ALJ asked about other employment that would be available to a hypothetical individual who was of the same age, education, and past work history as Brown, who could lift up to 20 pounds on occasion and 10 pounds frequently, could sit or stand for six hours in an eight-hour day, with an opportunity to alternate as necessary, had unlimited use of the extremities, could continuously handle, feel, and finger, should not climb ladders or scaffolding, but could occasionally climb stairs, could stoop, kneel, crouch, and crawl on an occasional basis, should try to avoid fumes, odors, and astringents, but had no problem doing normal housework, could operate a motor vehicle, would need to work at an unskilled level, should not work with the general public, had moderate limitation in her ability to interact appropriately with supervisors and coworkers, but should be able to follow, understand, and carry out simple instructions, had a poor educational level, but could read and write, and would not be able to do home health care on a full-time basis

20

because it exceeded her physical demand level. (Tr. 153-54). Schill stated there would be other jobs available at the light, unskilled level, including house cleaner, of which there were 5,200 positions in the region and 129,000 in the U.S.; photocopy machine operator, of which there were 900 positions in the region and 19,700 in the national economy; and cafeteria attendant, with 2,100 positions in the region and 86,000 in the U.S. (Tr. 155). The ALJ changed the hypothetical and asked about jobs available if the weight limit were lowered to a sedentary level, lifting 10 pounds on occasion and five pounds on a frequent basis, and the individual could sit for six hours but stand for only two hours. Schill stated the individual could work as an addresser, with 650 positions in the region and 16,000 in the U.S.; cut and paste press clippings, with 950 positions in the region and 18,000 in the U.S.; and surveillance monitor, with 185 positions in the region and 4,600 in the U.S. If the individual was only able to work for four hours per day, there would be no competitive employment. (Tr. 157). If she was not able to keep a set schedule, had difficulty maintaining mental effort, and took frequent unscheduled breaks, there would be no jobs in the U.S. (Tr. 157).

## D.    Additional Evidence

In a daily activities and symptoms report, Brown stated that she used the dishwasher and a self-cleaning vacuum. Her uncle did the laundry and she paid a young person to do outside chores. (Tr. 472). Brown said she did no errands and watched television all day. She ate fast food or cooked microwave meals. Brown said she could walk about one block before needing to stop to rest. She could go up about 10 steps if there was a handrail. (Tr. 473). Brown listed her symptoms as pain in the back, numbness in the neck, shortness of breath, fatigue, weakness, and dizziness.

21

She said she felt she was "falling apart." (Tr. 474). Brown listed her medications as Tylenol extra strength, Tylenol with codeine, and oxycodone. (Tr. 475).

In interrogatories dated November 11, 2008, Brown stated that she was first unable to work in December 1999 due to depression and anxiety and severe pain. (Tr. 510). Her doctor had recommended daily exercise and diet. Brown stated she was 5'2" tall and weighed 255 pounds. (Tr. 513). She said she could stand for 30 minutes, and sit for 20 minutes. (Tr. 514). In an eight-hour day, she could stand for four hours and sit for four or five hours. She said she could walk five blocks, She could pick up three to five pounds with one hand and 20 to 25 pounds with both hands. (Tr. 514). Her hobbies were taking care of her children and watching movies. (Tr. 515). In a typical day, Brown said she showered, dressed her children, fixed breakfast for her children, picked up her daughter from the school bus, cooked, and then slept or rested. (Tr. 516).  In  additional interrogatories on September 17, 2011, Brown stated she could not work because she became confused and could not get to her clients on time. (Tr. 565). She said she could not get along with people and had no energy. (Tr. 565). Brown said she had pain in her lower back and stomach, scoliosis of the spine, and had cancer in 2004. (Tr. 566). Brown said medications made her sleepy, so she took them if she did not need to get her children to school. (Tr. 567). Brown said in an eight-hour work day, she could stand for two hours, walk for one hour, and sit for two hours. She could pick up 10 pounds or less. (Tr. 569). Brown said she did her own personal hygiene. (Tr. 571).

### III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings."

*Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  *Id.* (citations omitted).  No deference is owed to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).  *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

# IV.   ANALYSIS

## A.   Listing 12.05

Brown asserts that the ALJ's finding that she did not meet Listing 12.05B or 12.05C was not supported by substantial evidence. (Pl.'s Br. at 17). She argues that the ALJ improperly determined that Corey's opinion supported a finding that Brown functioned at a higher level than suggested by her IQ scores, that the ALJ improperly weighed and evaluated Schuett's opinion to support a finding that Brown functioned at a higher level than suggested by her IQ scores, and that the ALJ failed to evaluate the assessments of Corey and Schuett to determine whether Brown met Listing 12.05 as required by the Appeals Council. (Pl.'s Br. at 17).

The ALJ considered Brown's intellectual impairment under the requirements of Listing 12.05, which has four paragraphs that must be satisfied. Paragraph A is met when there is mental incapacity evidenced by dependence upon others for personal needs and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. The ALJ found those requirements were not met because Brown could perform personal care tasks and had completed standardized testing. As to the requirements of Paragraphs B and C, the ALJ noted that Brown had a valid verbal, performance or full scale IQ of 59 or less and a physical or other mental impairment which imposed an additional and significant work-related limitation of function. (Tr. 14). However, the ALJ found that Brown failed to meet those paragraphs in light of her adaptive functioning overall. Section 12.00D(6)(a) of the Listing of Impairments states that the results of standardized intelligence tests are only part of the overall assessment. The narrative report that accompanies the test results should

24

comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.

The ALJ noted that when Schuett completed a consultative psychological evaluation and administered IQ tests, she noted that Brown had adaptive skills, significant work-related capabilities, and diagnosed learning disorder, NOS, rather than mild mental retardation. Schuett noted that Brown had learned how to live alone and handle her money, had no problem with social functioning, could concentrate and attend to a task to complete it, could understand, remember, and carry out short and simple instructions, could relate appropriately to coworkers and supervisors, and had adapted to changes in her environment. (Tr. 15). Corey administered IQ tests and opined that Brown had no limitations in understanding, remembering, and carrying out simple instructions. Corey noted that Brown had learned many other adaptive skills. (Tr. 16).

The ALJ gave substantial weight to the opinions of Schuett and Corey that Brown demonstrated a high degree of adaptive functioning despite her low IQ scores. Corey was an acceptable medical source and an examining source. Although Schuett was not an acceptable medical source, her opinion was entitled to weight under SSR 06-3P. The ALJ stated that the opinions were based on clinical findings, consistent with each other, and consistent with the record as a whole. The ALJ found that Brown did not have an impairment that met or equaled section 12.05B or 12.05C of the listing. (Tr. 16).

It is Brown's burden to demonstrate that she has an impairment that is presumed to be disabling. She must show through medical evidence that her impairment met all of the specified medical criteria contained in a particular listing. *Carlson v. Astrue*, 604

F.3d 589, 593 (8th Cir. 2010), *citing Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir.

2004).

> Listing § 12.05 requires:
>
> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> > B. A valid verbal, performance, or full scale IQ of 59 or less; or
> >
> > C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

Thus, Brown must first demonstrate that she has significantly subaverage general intellectual functioning that showed onset of the impairment before age 22.  The first IQ test that was administered as part of Brown's request for disability was given when she was 20 years old, and her full-scale IQ was 64. (Tr. 590). Brown did not meet the requirement of Listing § 12.05B because she did not demonstrate an IQ of 59 or less that had an onset before she turned 22.

To satisfy Listing § 12.05C, Brown must show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Phillips v. Colvin*, 721 F.3d 623, 625 (8th Cir. 2013), *citing McNamara v. Astrue*, 590 F.3d 607, 610-11 (8th Cir. 2010). Corey's evaluation in 2009 showed that Brown's full-scale IQ was 57, and she has met that requirement. (Tr. 806). However, she again has not demonstrated that her impairment began before age 22. School records from the

26

Omaha Public Schools showed that Brown was determined to have a specific learning disability in reading and math in 2004 and 2005, shortly before she left school, but she was not diagnosed with a cognitive impairment before that time. When she was 13, standardized testing showed scores in the average range in vocabulary, reading comprehension, and math concepts. (Tr. 528-58). As the Appeals Council noted, the record contained no explanation for any sudden decline in cognitive functioning at the consultative examinations beginning at age 19. (Tr. 2).

In addition, the record supports the ALJ's finding that Brown had no deficits in adaptive functioning. Schuett noted that Brown was able to live on her own and to take care of her children. (Tr. 593). She could understand, remember, and carry out simple instructions and relate appropriately to coworkers and supervisors. (Tr. 593). Brown had the ability to sustain concentration and attention needed for task completion. (Tr. 660). Newman also found that Brown had no limitations in the ability to remember work-like procedures. (Tr. 676). She had no limitations in the ability to ask simple questions or request assistance. She had moderate limitations in the ability to interact with the public and to get along with coworkers or peers. (Tr. 677). Corey determined that Brown was able to sustain her attention and concentration adequately. (Tr. 807). She had mild impairment in making judgments on simple work-related decisions. (Tr. 807).

The ALJ determined that the opinions of Corey and Schuett demonstrated that Brown had a high degree of adaptive functioning despite her low IQ scores. The court agrees that the opinions were based on clinical findings, were consistent with each other, and were consistent with the record as a whole. The ALJ correctly found Brown did not meet the requirements of Listing § 12.05.

27

**B.     Credibility**

Brown also argues that the ALJ improperly assessed her credibility because he failed to properly evaluate her subjective complaints regarding the impact of her mental impairments upon her ability to work. (Pl.'s Br. at 28). The ALJ found that Brown's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 18). The ALJ determined that Brown's impairments were not as severe as alleged and the ALJ did not give great weight to Brown's implicit allegation that she was unable to engage in any and all kinds of full-time, competitive, gainful employment on a sustained basis. (Tr. 22).

To analyze a claimant's subjective complaints, the ALJ considers the entire record, including medical records, statements from the claimant and third parties, and factors such as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain; 3) dosage, effectiveness, and side effects of medication; 4) precipitating and aggravating factors; and 5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. §§ 404.1529, 416.929.

Brown testified that she was able to care for her children and herself. She worked part-time as a home health care aide. These factors indicate an ability to work. Her claim that she is unable to work is inconsistent with all of the evidence. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000). In fact, no physician who examined Brown submitted a medical conclusion that she is disabled and unable to perform any type of work. *Id.*

One of the reasons given by Brown for her inability to work was her problem getting along with other people. Yet she did not present any evidence that she had made attempts to work in a situation where she would be required to get along with others. There was also evidence that antidepressant medications had improved Brown's demeanor, but she did not always comply with the prescriptions. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001), *citing Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999).

The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. *Johnson v. Apfel*, 240 F.3d 1145 (8th Cir. 2001). An ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible in light of objective medical evidence to the contrary. *Ramirez v. Barnhart*, 292 F.3d 576 (8th Cir. 2002). The court will not substitute its opinion for that of the ALJ.

## C.    Ability to Perform Other Work

Finally, Brown claims that the ALJ erred in finding that she could perform other work. She argues the finding is not based on substantial evidence because the ALJ's hypothetical RFC question to the VE did not reflect her limitations. (Pl.'s Br. at 29-30). The ALJ determined that Brown could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (Tr. 17).

In the sequential evaluation process, the burden of persuasion is with the plaintiff, but at step five, a limited burden of production shifts to the Commissioner. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The Commissioner may satisfy

this burden through the testimony of a vocational expert. *See* 20 C.F.R. §§ 404.1566€, 416.966(e).

In this case, the ALJ asked the VE a hypothetical question describing Brown's background and limitations. The VE testified that the hypothetical person could perform work in the unskilled light and sedentary labor market. (Tr. 155-57). Representative examples of such occupations included housecleaner, photocopy machine operator, cafeteria attendant, addresser, press clippings cutter and paster, and security surveillance monitor. (Tr. 155-57). For a VE's opinion to be relevant, an ALJ must accurately characterize a claimant's medical conditions in hypothetical questions posed to the VE. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). A VE's answer to a hypothetical question that includes all the limitations in the RFC provides a proper basis for an ALJ's decision. *See id.*

The ALJ was justified in relying on the VE's testimony as substantial evidence in finding that Brown was not disabled. *See* 20 C.F.R. §§ 401.1566(e), 416.966(e). The ALJ met the Commissioner's burden to show that a significant number of jobs exist in the national economy that an individual with Brown's impairments, symptoms, and limitations could perform.

## V.   CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.     The Commissioner's decision is affirmed;

30

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate

document.

Dated this 23rd day of July, 2014

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge